NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

---

IN RE TERMINATION OF PARENTAL RIGHTS AS TO J.B. and N.N.

No. 1 CA-JV 25-0009

FILED 07-15-2025

---

Appeal from the Superior Court in Maricopa County
No. JD503914
The Honorable Marvin L. Davis, Judge

**AFFIRMED**

---

COUNSEL

Maricopa County Office of the Public Advocate, Mesa
By Seth Draper
*Counsel for Appellant*

Arizona Attorney General's Office, Phoenix
By Ingeet P. Pandya
*Counsel for Appellee Department of Child Safety*

---

**MEMORANDUM DECISION**

Judge Daniel J. Kiley delivered the decision of the Court, in which Presiding Judge Angela K. Paton and Judge Brian Y. Furuya joined.

---

**K I L E Y**, Judge:

**¶1**        Lillian M. ("Mother") challenges the order terminating her parental rights to her two children. She argues that the court abdicated its decision-making authority by accepting, verbatim, the proposed findings of fact and conclusions of law lodged by the Department of Child Safety ("DCS") and that, in any event, the findings were insufficient to support the court's determination that DCS made reasonable and diligent reunification efforts. We affirm.

## FACTS AND PROCEDURAL HISTORY

**¶2**        We view the facts in the light most favorable to affirming the juvenile court's ruling. *See Christina G. v. Ariz. Dep't of Econ. Sec.*, 227 Ariz. 231, 234, ¶ 13 (App. 2011) (citation omitted).

**¶3**        Mother and Joshua B. ("Father") are the parents of J.B., born in 2022, and N.N., born in 2023.

**¶4**        When J.B. was born, hospital personnel contacted DCS to report that the baby was substance-exposed and Mother tested positive for methamphetamine, oxycodone, and tetrahydrocannabinol ("THC"). During an interview with DCS, Mother admitted using methamphetamine "on and off" for "the last twenty years." She further reported that, after a period of non-use, she resumed using methamphetamine "daily" in 2021 until she discovered she was pregnant, at which point she decreased her methamphetamine use to "every other day." Mother likewise admitted using marijuana during her pregnancy, explaining that she did not consider marijuana use to be "a problem" because "marijuana is legal." Mother denied using oxycodone and could not explain why she tested positive for it.

**¶5**        J.B. remained in the neonatal intensive care unit for over two weeks "due to withdrawal symptoms." While there, he required a feeding tube and a nasal cannula "due to having low oxygen levels."

**¶6**        Meanwhile, DCS filed a dependency petition. The juvenile court adjudicated J.B. dependent, and he was placed in a licensed foster home.

**¶7**        During its investigation, DCS learned that Mother had a 20-year history with DCS, including prior dependencies based on her substance abuse and neglect of her other children.

**¶8**        DCS offered Mother reunification services that included supervised visitation, substance abuse treatment through Terros, random

urinalysis testing, the Nurturing Parenting Program ("NPP"), and a referral for a case aide. Additionally, the court appointed a community resource coordinator to assist Mother and Father in securing housing and finding treatment services that they could "participate in as a family."

¶9          From the outset, Mother failed to consistently engage in services. Although Mother initially attended most supervised visits with J.B., she missed some scheduled visits, failing to show up with no advance notice or explanation. Mother attended some NPP sessions, but her inconsistent attendance led to the NPP referral being unsuccessfully closed out.

¶10         Mother failed to attend her scheduled intake session with Terros in October 2022, purportedly due to lack of transportation. DCS arranged for her transportation to a rescheduled intake session. Mother did not attend. A third intake session was scheduled and, again, Mother failed to attend. Her substance abuse treatment referral was then closed out.

¶11         When Mother began undergoing regular drug testing in November 2022, her test results were "often positive" for "methamphetamine, amphetamine, and THC." After she failed to appear for seven scheduled tests in March 2023, her referral was "suspended."

¶12         In late 2023, DCS learned that Mother was pregnant again and appeared to be homeless. A DCS specialist had difficulty reaching Mother and Father because they lacked reliable phone service. When the DCS specialist was able to reach Mother by phone in September 2023, she refused to disclose her location because she feared being taken into custody on outstanding arrest warrants.

¶13         In October 2023, Mother gave birth to N.N. at her home, which was described as "a shed" in "a yard" behind "a house." After the baby was born, Mother waited twelve days to seek medical care for her. After N.N.'s initial medical examination, the physician told Mother to bring her back for a follow-up appointment in three weeks. Based on N.N.'s condition at the follow-up — including "poor weight gain" and "pale gray skin" — the physician told Mother and Father to take her to an emergency room. The parents waited ten hours to bring N.N. to the emergency room. Upon admission, N.N. tested positive for methamphetamine and "was diagnosed with Failure to Thrive." Mother and Father told representatives from the Office of Child Welfare Investigations ("OCWI") that they had "given guardianship of their baby" to friends but admitted that they did not seek or obtain any guardianship orders. After obtaining court

authorization to remove N.N., OCWI, accompanied by officers with the Maricopa County Sheriff's Office ("MCSO"), went to the location where Mother had given birth to notify the parents of an upcoming DCS team decision-making ("TDM") meeting. When they arrived, Mother attempted to flee but was detained and arrested on two felony warrants.

¶14        DCS filed a dependency petition and the court adjudicated N.N. dependent as to both parents. She was placed in the same foster home in which her brother, J.B., had been placed.

¶15        DCS had some phone contact with Mother in 2023 and early 2024 regarding the children and kept her apprised of the dates and times of upcoming medical appointments and court hearings. Further, DCS invited the parents to attend "[f]amily [t]eam meetings."

¶16        Mother exercised visitation for the last time on May 3, 2024. After that, DCS lost contact with her, even after conducting public records searches to try to locate her.

¶17        In August 2024, DCS determined that the parents' lack of engagement in services over the course of the lengthy proceedings warranted changing the case plan to termination and adoption. The court granted DCS's request. DCS soon thereafter moved to terminate the parents' rights as to both children on substance-abuse and out-of-home placement grounds. *See* A.R.S. § 8-533(B)(3), (8)(b), (8)(c).

¶18        A termination trial was set in November 2024. The parents did not appear, nor did they contact the court or their counsel to explain their non-appearance. The court found that they had been served and failed to appear without good cause, and so proceeded in their absence.

¶19        A DCS specialist testified about the history of the case, including the reasons the children were taken into care, the parents' longstanding and ongoing substance abuse, their failure to engage in services, and the fact that both children are well cared-for in a loving home with a foster parent who intends to adopt them.

¶20        At the conclusion of the hearing, the juvenile court took the matter under advisement and ordered DCS to lodge proposed findings of fact and conclusions of law. DCS did so. The court adopted and entered the proposed findings of fact and conclusions of law (the "FOF/COL"). Noting that it "heard, considered and weighed all of the testimony, admitted exhibits . . . [and] arguments of counsel," the court found, in the FOF/COL, that DCS had established statutory grounds for termination of the rights of

both Mother and Father and that termination would be in the children's best interests.

**¶21**      Mother timely appealed.[1] This Court has jurisdiction under Article 6, Section 9, of the Arizona Constitution, and A.R.S. §§ 8-235, 12-120.21, and -2101(A)(1).

## DISCUSSION

**¶22**      The right to "the control and custody of one's children," though fundamental, is "not absolute." *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 248, ¶¶ 11-12 (2000) (citation omitted). The parental relationship may be terminated if the juvenile court finds at least one statutory ground for termination under A.R.S. § 8-533(B) proven by clear and convincing evidence and further finds, by a preponderance of the evidence, that termination is in the child's best interests. *Timothy B. v. Dep't of Child Safety*, 252 Ariz. 470, 474, ¶ 13 (2022) (citations omitted).

**¶23**      To establish grounds for termination under A.R.S. § 8-533(B)(3), DCS must prove that a history of chronic substance abuse has rendered "the parent 'unable to discharge parental responsibilities' and 'reasonable grounds' exist 'to believe that the condition will continue for a prolonged indeterminate period.'" *Jennifer S. v. Dep't of Child Safety*, 240 Ariz. 282, 287, ¶ 17 (App. 2016) (citing A.R.S. § 8-533(B)(3)). Additionally, DCS must show that it "made reasonable efforts to reunify the family or that such efforts would have been futile." *Jennifer G. v. Ariz. Dep't of Econ. Sec.*, 211 Ariz. 450, 453, ¶ 12 (App. 2005) (citations omitted).

**¶24**      To establish grounds for termination under A.R.S. § 8-533(B)(8)(c), DCS must prove that (1) the child has been in an out-of-home placement for a cumulative total period of at least fifteen months; (2) DCS made a diligent effort to provide appropriate reunification services; (3) the parent has been unable to remedy the circumstances that caused the child to be in an out-of-home placement; and (4) there is a substantial likelihood that the parent will not be capable of exercising proper and effective parental care and control in the near future. *See In re Z.L.*, 256 Ariz. 138, 143, ¶ 19 (App. 2023) (citations omitted). To establish grounds for termination of a parent's rights to a child under the age of three who has been in an out-of-home placement for longer than six months, DCS must prove both that it made a diligent effort to provide appropriate reunification services and that "the parent has substantially neglected or willfully refused to remedy

---

[1] Father is not a party to this appeal.

the circumstances" causing the out-of-home placement. A.R.S. § 8-533(B)(8)(b).

¶25        We will affirm a termination order absent an abuse of discretion. *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 47, ¶ 8 (App. 2004) (quotation omitted). We do not re-weigh the evidence, *id.*, but view it in the light most favorable to sustaining the juvenile court's decision, *Manuel M. v. Ariz. Dep't of Econ. Sec.*, 218 Ariz. 205, 207, ¶ 2 (App. 2008) (citation omitted).

¶26        Mother challenges the court's termination order, asserting that the court abused its discretion by adopting, without modification, the FOF/COL lodged by DCS. According to Mother, by accepting DCS's FOF/COL and entering them as its own, the court essentially "delegate[d]" its decision-making authority to DCS. Citing her constitutional right to have "factual and legal findings" made by "the trial court" and not the opposing party, Mother argues the court violated due process by "deferr[ing] its factual and legal finding power and responsibility to" DCS.

¶27        In response, DCS does not dispute that the court adopted its proposed findings and conclusions verbatim, but asserts that nothing in Arizona law "mandates that the court independently compose all of its findings or prohibits the court from asking one or more parties to lodge proposed findings." We agree with DCS.

¶28        A court may not, of course, abdicate its judicial responsibility by deferring to the views of a litigant or an expert witness. *See Nold v. Nold*, 232 Ariz. 270, 273-74, ¶¶ 13-14 (App. 2013) (quotation omitted) (vacating and remanding parenting time order because family court "abdicated its responsibility" to decide contested issues by adopting custody evaluator's recommendation as the presumptive outcome). But the mere fact that a court adopted proposed findings lodged by a party does not establish that the court abdicated its judicial role. On the contrary, case law has long recognized that a court may adopt a party's proposed findings as long as "those findings are consistent with the ones the court reaches independently after properly considering the facts." *Elliott v. Elliott*, 165 Ariz. 128, 134 (App. 1990) (citations omitted); *see also Andrea F. v. Dep't of Child Safety*, 1 CA-JV 20-0074, 2021 WL 162020, at *4, ¶ 22 (Ariz. App. Jan. 19, 2021) (mem. decision) (rejecting argument that court abdicated its fact-finding responsibility and noting that "the court was free to direct the parties to submit proposed findings and conclusions and was free to adopt any of those findings and conclusions it determined were appropriate").

**¶29** We presume that a court "fully considered" the relevant evidence before issuing its decision. *Fuentes v. Fuentes*, 209 Ariz. 51, 55-56, ¶ 18 (App. 2004) (citation omitted); *see also In re Marriage of Gibbs*, 227 Ariz. 403, 410, ¶ 21 (App. 2011) (citation omitted) (holding that although the court did not discuss the evidence in detail, "we presume it fully considered the relevant evidence"). Mother, therefore, bears the burden of establishing that the court abdicated its judicial responsibility when it adopted DCS's proposed FOF/COL. *Cf. Fuentes*, 209 Ariz. at 55, ¶ 18.

**¶30** In support of her position that the court improperly delegated its fact-finding authority, Mother notes that the court's FOF/COL was "nearly identical" to the allegations in DCS's termination motion. But by failing to appear at trial, Mother admitted the factual allegations set forth in DCS's termination motion. *See* Ariz. R.P. Juv. Ct. 353(f); *Brenda D. v. Dep't of Child Safety*, 243 Ariz. 437, 440, ¶ 1 (2018) ("[I]f a parent fails to appear at a termination adjudication hearing without good cause, Arizona law vests the juvenile court with discretion to find that the parent has waived his or her legal rights and admitted the motion's allegations." (citation omitted)). There is certainly nothing improper (or even unusual) about a court's accepting, verbatim, factual allegations by one party that the opposing party has admitted.

**¶31** A court's adoption of proposed findings that lack a factual basis in the record may indicate an abdication of judicial responsibility. *Cf. Matter of Hamilton*, 637 P.2d 542, 545 (N.M. 1981) ("[T]he adoption of verbatim findings is not in error if they are supported by the record." (citation omitted)). Invoking this principle, Mother asserts that the court's FOF/COL include factual findings and conclusions about reunification services that lack support in the record. According to Mother, these purported "factual mistakes and baseless conclusions" indicate that the court abdicated its fact-finding role by uncritically accepting DCS's unsupported assertions.

**¶32** Mother identifies, as one example of the FOF/COL's purportedly unsupported findings, the finding that she was "referred to community resources." According to Mother, evidence to support this finding "do[es] not appear in the record." Mother's assertion is incorrect; the record shows that, in December 2022, the court appointed a community coordinator to help the parents secure housing and assistance in family treatment services.

**¶33** As another example of the FOF/COL's purportedly unsupported findings, Mother cites the finding that she had been "offered

case plan staffings." But the record shows that a DCS specialist made efforts to maintain contact with Mother by phone and email to keep her apprised of the times and dates of scheduled medical appointments and court hearings. Further, DCS scheduled in-person meetings with Mother to discuss the case plan. And the parents were invited to TDM meetings so they could participate in discussions about the children.

¶34      Mother does not dispute that these "phone conversations, emails, . . . in-person meetings and [TDM] meetings" took place. She insists, however, that the court had no basis on which to conclude that these communications and meetings "qualify as case plan staffings" because "[c]ase plan staffings is not a legal term."

¶35      Mother does not identify any type of meeting that should have been held but wasn't, nor does she identify any particular communication that should have been made but wasn't. Because Mother does not dispute that DCS personnel held numerous meetings about this case to which Mother was invited, nor does she dispute that DCS attempted to maintain contact with her by phone and email, her complaint about the FOF/COL's use of the label "case plan staffings" when referring to these meetings and communications raises nothing more than an issue of semantics that entitles her to no relief.

¶36      Mother also alleges that the record does not support the FOF/COL's findings about the circumstances of her arrest shortly after N.N. was born in October 2023. Specifically, Mother asserts the record does not support the FOF/COL's statement that when N.N. was removed from her parents' care, Mother "was taken into custody" on outstanding warrants for a "probation violation and a drug possession charge from November 2022." Mother admits that she was arrested on outstanding warrants, but maintains that the record contains no evidence that the warrants were issued for a "probation violation" or "a drug possession charge."

¶37      Again, the record refutes this assertion. The verified petition that DCS filed in support of its request that the court adjudicate N.N. dependent includes an allegation that after N.N.'s removal, Mother was "taken into custody" on "active warrants for her arrest for [a] probation violation and a drug possession charge from November 2022." This sworn allegation constitutes evidence to support the court's finding.

¶38      We reject, as contrary to the record, Mother's claim that the FOF/COL contains unsupported factual findings that give rise to an

inference that the juvenile court delegated its judicial responsibility to DCS. We further hold that Mother has failed to meet her burden of showing that the court improperly deferred to DCS by adopting the proposed findings and conclusions that DCS lodged after trial.

**¶39**     Mother argues, in the alternative, that the court's termination order should be set aside because no evidence supports the determination that DCS provided reasonable reunification services.

**¶40**     DCS has "an affirmative duty to make all reasonable efforts to preserve the family relationship" before it seeks "to terminate parental rights." *Christina G. v. Ariz. Dep't of Econ. Sec.*, 227 Ariz. 231, 234-35, ¶ 14 (App. 2011) (quotation omitted). To fulfill this obligation, DCS must provide the parent "with the time and opportunity to participate in programs designed to help her to become an effective parent." *Id.* at 235, ¶ 14 (quotation omitted). DCS is not, however, required "to provide every conceivable service," *id.* at ¶ 15 (citation omitted), nor is it required "to ensure that a parent participates in each service it offers," *Maricopa Cnty. Juv. Action No. JS-501904*, 180 Ariz. 348, 353 (App. 1994) (citation omitted).

**¶41**     Citing case law recognizing DCS's "duty" to "provide reunification services," *Jessie D. v. Dep't of Child Safety*, 251 Ariz. 574, 581, ¶ 18 (2021), Mother argues that the court erred in finding that DCS satisfied this duty. According to Mother, the court erred, for example, in considering the services of the community resource coordinator in determining whether DCS made appropriate reunification efforts. The coordinator does not "qualif[y] as a community resource *provided by DCS*," Mother argues, because "the community [resource] coordinator was appointed" directly "by the trial court" (emphasis added).

**¶42**     The obligation to provide reunification services stems from the fundamental right of parents to the care and custody of their children, which, in turn, imposes an obligation on the State to attempt to preserve the family relationship. *See Jessie D.*, 251 Ariz. at 581, ¶ 18 ("Arizona courts have . . . recognized a requirement to engage in reunification efforts on constitutional grounds as a necessary element of any state attempt to overcome the fundamental liberty interest of the natural parents in the care, custody and management of their child." (citation modified)); *Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 186, ¶ 1 (App. 1999) ("It is well established that the State, before acting to terminate parental rights, has an affirmative duty to make all reasonable efforts to preserve the family relationship." (citations omitted)). These constitutional requirements are satisfied if appropriate reunification services are provided, regardless of

how or by whom they are provided. *See* A.R.S. § 8-846(B) ("If the court determines that services supplemental to those provided through the department are available from another source at no cost to this state, the court may order the services on agreement of the provider."). Because Mother does not dispute that a community resource coordinator was appointed, she is entitled to no relief on her complaint that the appointment was made by the court rather than DCS.

**¶43**        In her reply brief, Mother contends that the record is devoid of evidence that the community resource coordinator ever "provided [Mother] with any services," or even "spoke with [her]." For a number of reasons, we find Mother is not entitled to relief.

**¶44**        First, Mother waived this argument by raising it for the first time in her reply brief. *Marco C. v. Sean C.*, 218 Ariz. 216, 219, ¶ 8 n.1 (App. 2008) (citation omitted). Second, if Mother was of the view that the coordinator was not providing appropriate assistance, she should have raised that issue with the juvenile court. *Shawanee S. v. Ariz. Dep't of Econ. Sec.*, 234 Ariz. 174, 178-79, ¶ 16 (App. 2014) (holding that the dependency process "demands that parents voice their concerns about services to the juvenile court in a timely manner" because "a parent's failure to assert legitimate complaints in the juvenile court about the adequacy of services needlessly injects uncertainty and potential delay into the proceedings"). Nothing in the record indicates that Mother ever voiced such concerns. Because she failed to do so, her belated complaint on appeal does not entitle her to relief. *See id.* at 179, ¶ 18 (holding that parent waived challenge to adequacy of reunification services by raising it for the first time on appeal).

**¶45**        In a final challenge to the FOF/COL, Mother complains that the FOF/COL uses the phrase "including but not limited to" when listing the exhibits that the trial court considered.[2] Mother does not dispute that all of the exhibits that are identified in the FOF/COL were properly admitted at trial. She asserts, however, that the phrase "including but not limited to" indicates that the trial court considered additional, unidentified documents or evidence that are not part of the record.

**¶46**        In our view, Mother reads too much into the phrase "including but not limited to." All the findings in the FOF/COL are

---

[2] Specifically, the FOF/COL recites that "[t]he Court heard, considered and weighed all of the testimony, admitted exhibits including, but not limited to, [Exhibits 1 through 7], arguments of counsel and written submission of the parties."

supported by evidence in the record; none of those findings appear to be based on information gathered from an extrajudicial source. Mother has not shown that the phrase "including but not limited to" is anything other than stylistic surplusage. *Cf. State v. Hall*, 204 Ariz. 442, 447-48, ¶ 17 (2003) (stating that a defendant bears the burden of establishing that jurors "received and considered extrinsic evidence"). The appearance of this phrase in the FOF/COL entitles Mother to no relief.

**¶47**        The court found that DCS had established grounds for termination under A.R.S. § 8-533(B)(3) and (8). Mother only challenges the court's finding that Mother was provided with appropriate reunification services. For the reasons set forth above, we reject this assertion. We further affirm, as unchallenged, the court's remaining findings under A.R.S. § 8-533(B)(3) and (8). *See Crystal E. v. Dep't of Child Safety*, 241 Ariz. 576, 577-78, ¶ 5 (App. 2017) (citations omitted) (affirming court's finding of statutory ground for termination that parent failed to challenge on appeal).

**¶48**        Before terminating parental rights, the court must also find that termination would be in the children's best interests. The court made such a finding here, and Mother does not challenge it on appeal. We therefore affirm this finding. *See id.*

## CONCLUSION

**¶49**        For the foregoing reasons, we affirm the juvenile court's order terminating Mother's parental rights as to J.B. and N.N.



**MATTHEW J. MARTIN • Clerk of the Court**
**FILED**:        JR